**Michael GUIDRY, Plaintiff-Appellant,**

v.

**CONTINENTAL OIL COMPANY et al., Defendants-Appellees,**

**Travelers Insurance Company, Intervenor-Appellee.**

No. 78-3474.

United States Court of Appeals, Fifth Circuit.

March 9, 1981.

Rehearing Denied April 6, 1981.

524

J. Minos Simon, Thomas D. Curtis, Lafayette, La., for plaintiff-appellant.

James T. Guglielmo, Opelousas, La., for Continental, et al.

John Blackwell, New Iberia, La., for Marlin Drilling.

Don L. Broussard, Lafayette, La., for intervenor-appellee.

Before BROWN, AINSWORTH and FRANK M. JOHNSON, Jr., Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Plaintiff, Michael Guidry, appeals grant of summary judgment in favor of his employer, defendant, Offshore Casing Crews, Inc. (Offshore), direction of verdict for defendants, Continental Oil Co. (Continental) and Marlin Drilling Co. (Marlin), and imposition of $500 sanction against his counsel for costs and expenses incurred by defendants in general actions for negligence brought under the Jones Act, 46 U.S.C. § 688, and general maritime law. Guidry asserts on appeal District Court erred in (i) granting summary judgment since he was a seaman, (ii) directing the verdict, finding his conduct was the sole proximate cause of the accident, and (iii) imposing the sanction after judgment when the record was not held open, no court order was ever violated, and no motion for sanctions was made. Finding Guidry was not a seaman under the Jones Act and that the sanction was properly imposed, we affirm.

### How it all Happened

Offshore is a specialist in setting and removing casing pipe in oil rigs. On July 5, 1976, Offshore sent a casing crew under the direction of Guidry as pusher to oil well Number One owned by Continental and located at East Cameron Block 42, O.C.S.[1] Marlin had contracted to drill the well, utilizing its rig Number Six, a self-elevating mobile drilling platform.

Guidry's assignment to this rig was random, it being his twenty-ninth since commencing his employment with Offshore on

---

1. The well was approximately thirty to fifty miles off the Louisiana coast, situated on the outer continental shelf.

January 31, 1976.[2] His connection with most of the structures was brief, usually less than two days.[3] On this particular occasion, Guidry's crew consisted of Michael Hazlett as stabber[4] and floor hands Thomas Trahan, Carl Simoneaux, and John Breaux.

The drill floor of the Marlin Six had an upset rotary table.[5] As is common in such rigs, the drawworks were situated to the rear of the drill floor while the V-door, the aperture through which drill pipe and equipment is brought onto the drill floor was in front. In addition to a jerkline,[6] the rig was equipped with three lifting devices—the main drum of the drawworks, the catline which operates off an auxiliary drum on the drawworks, and the air hoist. The catline was operated from behind the driller's stand[7] which provides a limited view of the drill floor and V-door through a peephole while the operator of the air hoist had an unrestricted view of the drill floor since the controls are next to the V-door.

After arriving at the rig, Guidry and his crew were assigned quarters at the direction of Continental's representative as preparations for pushing the casing had not yet been completed. Approximately twenty-four hours after arriving at the platform, Guidry was called to the rig floor to commence his duties.[8] Upon reaching the rig floor, Guidry found Marlin had already placed the various casing equipment on the rig floor. That specialty equipment included, among other things, elevators, baffle plates, tongs, a hydraulic power unit, 10,000 feet of drill pipe, and drill pipe nubbings.

Although Continental was overseer of the well, Guidry and his crew were in charge of the rig floor once they began their casing duties. After spending approximately ten minutes moving the hydraulic unit with the jerkline, Guidry noticed Hazlett was attaching the catline to the elevators. Guidry went over to assist Hazlett,[9] positioning himself in between the elevators and the rotary table so that his back was to Trahan.

Hazlett had previously sent Trahan to operate the catline. As Trahan did not have complete view of the drill floor, Hazlett gave him signals to raise the elevators. The accident occurred when the elevators hung up on one of the other pieces of equipment, causing them to swing towards Guidry. The impact caused Guidry to slip on the muddy, wet rig floor. Although he attempted to move out of the way, Guidry's right foot was crushed when the 2,000 pound elevators smashed into the upset rotary table.[10]

### Litigation Ensues

Due to the injuries sustained to his foot, Guidry brought this action on July 7, 1977, against Offshore, Marlin, and Continental under the Jones Act and general maritime law. In his complaint, Guidry alleged he was a seaman "at all times material hereto, ... permanently assigned as a member of the crew, operating, maintaining and controlling the vessel known as Marlin 6 and his duties encompassed the furtherance of

2. Guidry was employed only once on twenty-four of the rigs and never ran more than three times casing on any of the structures to which he was assigned. Most of these assignments were to either fixed or jack-up offshore rigs in the Gulf; however, three of Guidry's assignments were to land based rigs.

3. Even some of that time, as much as one-third, would be consumed not by working but by travel to and from structures.

4. Stabber is the term used for the person who is second in command of the crew.

5. This type of rotary table is not flush with the deck of the rig, but rather, a step up from the rest of the platform floor.

6. The jerkline provides lateral movement of equipment and other materials located on the drill floor.

7. The driller's stand is located to the side of the drawworks.

8. During the interim waiting period, Guidry engaged in no activities which contributed to the rig's mission.

9. Rigging up the elevators normally requires the joint efforts of two or three men.

10. Guidry's foot sustained multiple fractures for which he remains permanently and totally disabled.

the principal mission of [the] aforesaid vessel." Guidry contends his "injuries resulted from the negligence of defendants, . . . their employees, agents and/or representatives, as well as the failure of defendants to provide [him] with a safe place in which to work." He also complained the vessel, its equipment, and appurtenances to which he was assigned, were unseaworthy. Offshore and Continental answered, denying Guidry was a seaman under the Jones Act, alleging rather he was limited to claims under the Longshoremen and Harbor Workers' Compensation Act (LHWCA), all of which claims had been met, while Marlin denied Guidry's contentions for lack of sufficient information, averring (i) Guidry's conduct was the proximate cause of the accident, and (ii) he had assumed the risk. Travelers Insurance Company as compensation insurer for Offshore, claiming reimbursement for compensation and medical expenses paid to Guidry, was permitted to intervene under 33 U.S.C. § 933.

Prior to trial, Offshore moved for summary judgment which District Court granted, ruling that the pleadings, depositions, affidavits, and exhibits established beyond dispute Guidry was not assigned to any specific vessel or group of vessels, his assignment to any particular structure was on a random basis, most of the structures on which he ran casing was for a relatively short period of time, during waiting periods he was not performing any services which contributed to the mission of the rig, and he was not a seaman.

11. Two separate helicopter trips were made by counsel for the parties. The first trip was made by Marlin, Offshore, and Continental on July 24, 1978. Guidry's counsel was supposed to make this trip also, but cancelled due to a conflict after Marlin had already paid for use of the helicopter. At Marlin's expense, a second helicopter trip was arranged on August 12, 1978, for Guidry's counsel to inspect the rig.

12. The total Bill of Costs filed September 13, 1978, was for $3,908.10 as follows:

The remaining actions against Continental and Marlin, and the claim for reimbursement by Travelers went to trial before a jury. At the close of Guidry's evidence, Continental and Marlin each moved for a directed verdict both of which District Court granted, ruling (i) no showing was made Continental had the duty of supervising the details of the work done by either Offshore or Marlin, (ii) no evidence was before the Court that Marlin's pusher or any member of Marlin's crew was on the rig floor at time of the accident, and Guidry was (iii) in complete control of all actions on the rig floor at the time the accident occurred, (iv) responsible for the safety of himself and his crew, so that (v) his actions were the proximate cause of the accident, (vi) constituting 100% contributory negligence. Judgment dismissing the complaint with costs in favor of Continental and Marlin accordingly was entered on August 20, 1978. On that same day, the intervention by Travelers was dismissed at its own cost.

## Wrangling Over Costs

Pursuant to Judgment, Marlin submitted a Bill of Costs to the Court requesting $822 for "cost of transportation to Drilling Rig offshore, Louisiana in connection with motion to compel entry" for two trips to the oil rig.[11] Costs were taxed against Guidry in accordance with this Bill of Costs on September 15, 1978.[12] Guidry immediately filed a Motion to Review and Set Aside the Bill of Costs as containing items not properly taxable under 28 U.S.C. §§ 1821 and 1920 as costs and not itemized so as to specify

**BILL OF COSTS**

| | |
|---|---|
| Fees of the clerk | $ ..... .... ........... . |
| Fees of the marshal | ..... .... ...... ..... |
| Fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case | ... 661.40 ..... |
| Fees and disbursements for printing | .. .... .... .......... . |
| Fees for witnesses (itemized on reverse side) | ...1,970.20 ..... .. |
| Fees for exemplification and copies of papers necessarily obtained for use in case | .. . . ..... ...... ... |
| Docket fees under 28 U. S. C. 1923 | ... 20.00 ....... |
| Costs incident to taking of depositions | .... 349.50 ........ |
| Cost as shown on Mandate of Court of Appeals | .. . ..... .... ...... ...... |
| Other Costs (Please itemize) | ..... ..... . ............ |
| Medical examination by Dr. Meuleman (not kept) | .... .35..00 ............ |
| Cost of transportation to Drilling Rig offshore, Louisiana in connection with motion to compel entry | ... ..822..00 ..... ... |
| Medical examination by Dr. Meuleman on August 1, 1978 | . ...50..00 ......... .. .. |
| | ..... .... . .......... |
| Total | $..3..908..10 ........ ...... |

the charges sought for distinguishable subparts of the total claims.

Prior to Marlin's filing of its Bill of Costs, Guidry filed his appeal to this Court on September 6, 1978, with the entire record and a certified copy of the docket sheet being mailed to this Court on November 2, 1978. On February 22, 1979, the Court denied Guidry's motion, finding the costs were occasioned by his counsel's failure to make the first trip arranged at his request. Guidry on March 21, 1979, filed a Motion to Recall that ruling arguing the assessment of costs was not supported by the evidence and jurisprudence relating to such evidence. After oral argument, the Court on June 8, 1979, found that Marlin was seeking to have the cost of the first trip taxed as a sanction against Guidry for not complying with the discovery procedure he had initiated rather than taxing the expense as costs. Concluding Guidry's counsel was responsible for the necessity of the second trip, District Court assessed $500 as a sanction for failing to cooperate in the discovery procedure Guidry initiated.[13]

### Employer Liability—Jones Act?

With respect to the grant of summary judgment in favor of Guidry's employer, Offshore, Guidry argues District Court erred since he was a seaman. He contends the Jones Act extends coverage to "seamen" and "members of the crew of a vessel," that the terms are now used interchangeably, and that he was a member of the crew of a vessel. To support these contentions, Guidry cites our well-settled standards of determining seamen status set forth in *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959), providing a plaintiff may qualify as a seaman

(1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and

(2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

*Id.* at 779.[14]

In light of these principles, Guidry claims he may attain seaman status by meeting either of these criteria. Initially, Guidry argues the Marlin Six was a vessel which we may safely assume is so. Guidry asserts he did more than merely eat and sleep on the vessel—that is, he substantially performed his casing duties aboard the Marlin Six and his duties pushing casing constituted a function essential to Marlin's mission of drilling for oil.

To this Offshore points out that the Court determined these factors did not sufficiently establish Guidry's status as a seaman where he was not permanently assigned to any vessel or group of vessels.

■ As in any civil case, we must review the record to assure no dispute over material facts exists. *Hodges v. S. S. Tillie Lykes,*

---

13. District Court entered this ruling on June 8, 1979, reasoning one of Guidry's counsel knew of the trip schedule on July 21, 1978, but failed to inform defense counsel until July 24, 1978, the date of the inspection, that co-counsel for plaintiff would be making the trip to the rig to conduct the inspection. In reaching this conclusion, District Court acknowledged Guidry's counsel failed to submit any reason for failing to inform defense counsel sooner that co-counsel desired to inspect the rig but was unable to make the July 24th date.

14. These requisites were later refined by our decision in *Bodden v. Coordinated Caribbean*

*Trans., Inc.,* 369 F.2d 273 (5th Cir. 1966), as (i) the vessel on which the claimant is employed must be in navigation, (ii) there must be a more or less permanent connection with the vessel, and (iii) the claimant must be aboard primarily to aid in navigation. More recently we stated to qualify as a seaman a claimant under the Jones Act "must be permanently assigned to or perform a substantial part of his work on the vessel, and the capacity of his employment must contribute to the function of the vessel, its mission, its operation, or its welfare." *Beard v. Shell Oil Co.,* 606 F.2d 515, 517 (5th Cir. 1979).

512 F.2d 1279, 1280 (5th Cir. 1975).[15] Thus, although, determination of a person's status as a seaman is ordinarily a mixed question of law and fact,[16] where the facts establish beyond question as a matter of law,[17] "[a] court . . . may, in the proper case, hold that there is no reasonable evidentiary basis to support a jury finding that an injured person is a seaman . . . under the Jones Act." *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1346 (5th Cir. 1980) (quoting *Beard v. Shell Oil Co.*, 606 F.2d 515, 517 (5th Cir. 1979)). It remains, however, the "moving party's burden to establish his right to summary judgment with such clarity that the nonmoving party cannot recover (or establish the defense) under any discernible circumstance." *Everhart v. Drake Management, Inc.*, 627 F.2d 686, 690 (5th Cir. 1980).

■ Examining the pre-trial record under these precepts, we find Guidry was indeed performing his duties on a vessel.[18] The question remains, therefore, whether he sufficiently met the remaining *Robison* requirements to establish his status as a seaman.

■ We conclude, however, he has not. Although Guidry was clearly performing duties essential to the function of the Marlin Six—pushing casing for oil wells—he has not shown any permanent assignment or performance of a substantial part of his duties on either the Marlin Six or any other specified group of vessels. *See, e. g., Rotolo*

*v. Halliburton Co.*, 317 F.2d 9, 13 (5th Cir. 1963).[19] In so holding, we are cognizant the word "permanent" has never been assigned a literal interpretation under the Jones Act and should not be given a "wooden application," but rather, is to be used as an analytical starting point instead of a self-executing formula. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 337 (5th Cir. 1977) (citing *Brown v. ITT Rayonier, Inc.*, 497 F.2d 234, 337 (5th Cir. 1974)). Yet, the relationship between the individual and an identifiable vessel or group of vessels must be substantial in point and time, not spasmodic. *Braniff v. Jackson Ave.—Gretna Ferry, Inc.*, 280 F.2d 523, 528 (5th Cir. 1960). The key is that there must be a relationship between the claimant and a specific vessel or identifiable group of vessels.

Guidry's deposition was quite explicit his assignment to any particular structure was random. At no time was he assigned to work on a particular rig on a continuing or regular basis. *See, e. g., Stokes v. B. T. Oilfield Services, Inc.*, 617 F.2d 1205, 1207 (5th Cir. 1980); *Keener v. Transworld Drilling Co.*, 468 F.2d 729, 732 (5th Cir. 1972). Indeed, of the forty different rigs Guidry was assigned to during his career, thirteen were non-vessel fixed platforms, seven were on land, and of the remaining twenty movable rigs he was on thirteen only once and never did he return to a specific rig more than three times.[20]

15. *See, e. g., Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 479–80 (5th Cir. 1976), *cert. denied*, 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977); *Owens v. Diamond M. Drilling Co.*, 487 F.2d 74, 76 (5th Cir. 1976).

16. *Crador v. Louisiana Dept. of Highways*, 625 F.2d 1227, 1229 (5th Cir. 1980).

17. *Landry v. Amoco Production Co.*, 595 F.2d 1070, 1072 (5th Cir. 1979).

18. Generally, floating rigs, because of their mobility, are treated as vessels. Robertson, *Injuries to Marine Petroleum Workers: A Plea, for Radical Simplification*, 55 Tex.L.Rev. 973, 982 (1977). *See also generally* Annot., 75 A.L.R.2d 1312 (1961). The test used in this Circuit for determining whether a water craft constitutes a Jones Act vessel requires examination of (i) the purpose for which it is constructed, and (ii) the

business in which it is engaged. Sipple, *Admiralty*, 31 Mercer L.Rev. 825, 831 (1980).

19. In reaching these conclusions, we remain aware of Guidry's contentions he may be considered a Jones Act seaman if he meets either criteria set forth in *Robison*. Fifth Circuit case law is clear, however, Guidry must meet all of the *Robison* requirements, not merely one or another.

20. Offshore's uncontradicted exhibits seven, twelve, and sixteen reflected, assignment by assignment, nature and type of rig and hours spent in boat time, waiting time, and working time on "vessel" rigs. Work time ran from a minimum of two hours to a maximum of eighteen; waiting time from a minimum of four hours, maximum fifty-eight; boat time from a minimum of one hour, maximum of nineteen.

*Unseaworthiness Claim as to Offshore*

■ Failing to establish his status as a Jones Act seaman, what rights of recovery does Guidry possess against Offshore on his unseaworthiness claim? Because Marlin, not Offshore, is the owner of the vessel, Guidry's claims against Offshore for unseaworthiness must fail as the remedy traditionally is available only against the shipowner and the vessel. *Stokes v. B. T. Oilfield Services, Inc.,* 617 F.2d 1205, 1207 (5th Cir. 1980). This is true even if Offshore were indeed liable. *Wixom v. Boland Marine & Mfg. Co.,* 614 F.2d 956, 957 (5th Cir. 1980). He may not recover on his unseaworthiness claim.

## What About LHWCA?

■ Guidry is limited to recovery for his injuries under LHWCA § 905(b).[21] *See, e. g., Billings v. Chevron, U. S. A., Inc.,* 618 F.2d 1108, 1109 (5th Cir. 1980). In granting summary judgment, however, the District Court understandably made no mention regarding Guidry's right to LHWCA benefits against Offshore. Without intimating any assessment as to Guidry's right to recover benefits, our affirmance is without prejudice to whatever claims against Offshore he has under LHWCA § 905(b).[22]

*Liability of Continental and Marlin*

Since Continental and Marlin were not Guidry's employers, but rather, third parties involved in the accident, and, the Court granted directed verdicts in their favor at the close of Guidry's evidence, we must examine Guidry's claims and status independently from any determinations made with respect to Offshore.

As to the so-called Jones Act claim, for the reasons discussed as to Offshore, we again conclude sufficient evidence was not presented to show Guidry was a Jones Act seaman. Guidry's trial testimony clearly negated his claims for Jones Act seaman's status as set out by *Robison.* At no time was Guidry assigned to any specific vessel or group of vessels. *Braniff,* 280 F.2d at 528. Nor did he perform a substantial part of his duties on either the Marlin Six or any other specified group of vessels. *Id.* Taking all relevant inferences in Guidry's favor, we conclude District Court properly determined Guidry was not entitled to recover against either Continental or Marlin as a Jones Act seaman.

As to a general maritime claim against Continental, Guidry argues the Court erred in directing the verdict in favor of Continental because it applied the wrong standard in reviewing the evidence and should

**21.** Title 33 U.S.C. § 905(b) provides:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury oc-

curred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

The Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, as enacted in 1953, extended coverage of the LHWCA, 33 U.S.C. §§ 901–50 (1976 & Supp. I & II 1977–78), for injuries or deaths occurring to employees on the Outer Continental Shelf. *See, e. g., Longmire v. Seas Drilling Co.,* 610 F.2d 1342, 1351–52 (5th Cir. 1980).

Because Marlin was the vessel owner while Guidry was employed by Offshore, Guidry is limited to recovering only compensation benefits from Offshore and may not also maintain a third party action for negligence under the LHWCA against Offshore. *See, i. e., Smith v. M/V Captain Fred,* 546 F.2d 119 (5th Cir. 1977).

**22.** Our holding includes all questions of Traveler's obligations to Offshore as LHWCA compensation carrier. *See* 33 U.S.C. § 933(h).

not have taken the case from the jury. Moreover, Guidry complains, if a directed verdict was in order, the greater weight of evidence required that it be directed in his favor. Guidry specifically contends the Continental "company man" was responsible for overseeing the whole operation and was in charge at the time the accident occurred since Continental owned the well. He claims Continental was negligent in securing the hoses for the power unit, having obtained ones which were too short, and as a result, forced the power unit to be placed on the rig floor instead of the floor below, causing congestion. He also claims the rig floor was covered with mud and water which caused him to fall.

In response to these allegations, Continental points out Guidry admitted on cross-examination (i) he did not even know who the company man for Continental was, (ii) had an opportunity to conduct a safety inspection of the rig floor before commencing his work, but failed to do so, and (iii) it was common for rig floors to be covered with mud and water. Continental also counters Guidry was the sole person in charge of the rig floor at the time the accident occurred.

■ We conclude there is insufficient basis to support any general maritime negligence claim against Continental. No Continental employee was on the rig floor at the time of the accident nor did any Continental employee have anything to do with, or responsibility for, this operation. Guidry established the rig floor was covered with mud and water and the hoses for the power unit secured by Continental were too short, but did not adequately establish that Continental was negligent in attempting to secure proper hoses or in maintenance of the rig floor conditions. On the contrary, it was shown mud and water covered rig floors are an accepted, frequent occurrence as part of these operations. Under such circumstances we cannot conclude Continental was negligent nor its actions a substantial legal cause of Guidry's injuries. For these reasons, Guidry's claims against Continental

were properly dismissed on directed verdict. *Hebron v. Union Oil Co.*, 634 F.2d 245, 247 (5th Cir. 1981); *Caldwell v. Manhattan Tankers Corp.*, 618 F.2d 361, 362–63 (5th Cir. 1980); *Boeing Co. v. Shipman*, 411 F.2d 365, 374–76 (5th Cir. 1969) (en banc).

With respect to Marlin, Guidry additionally argues the Marlin crane operator disregarded the instructions of Offshore floorhand Simoneaux to bring casing equipment up to the rig floor one at a time as the casing crew needed it. Instead, Guidry contends the Marlin crane operator placed all the equipment and had all the drill pipe on the floor contrary to normal practice. Guidry suggests Marlin was negligent due to the fact the Marlin Six had an upset rotary table, normally platforms had rotary tables which were flush with the rig floor, and if the rotary table had been as normal, his foot would have been simply pushed aside rather than crushed when the elevators began to swing.

Since we have already determined Guidry was not a seaman his claims must be analyzed in light of the 1972 amendments to the LHWCA, 33 U.S.C. § 905(b) (1978), which permits recovery of damages caused by the negligence of the third party. *Mallard v. Aluminum Co.*, 634 F.2d 236, 242 (5th Cir. 1980). In granting the directed verdict, however, District Court did not explicitly state it was denying Guidry's claims under the LHWCA. Nevertheless, the ruling was sufficiently articulated to permit our review of Guidry's LHWCA remedies under appropriate standards.

■ This Circuit has adopted a negligence standard governed by concepts of a landowner's duties to his invitees as enunciated in § 343A(1) of the Restatement (Second) of Torts:

A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.[23]

23. *See Stockstill v. Gypsum Transportation,* 607 F.2d 1112, 1116–17 (5th Cir. 1979); *Wiles*

*v. Delta Steamship Lines, Inc.*, 574 F.2d 1338, 1340 (5th Cir. 1978); *Samuels v. Empressa Li-*

Restated in terms of vessel owners and contractor employees, these negligence criteria "subject a shipowner to liability only if he knows or has reason to know of an unreasonably dangerous condition on the vessel of which the [employee] is probably not aware and fails to exercise reasonable care to make the condition safe or warn the longshoreman." *Mallard*, 634 F.2d at 243. We acknowledge that the Ninth Circuit has established a contrary standard.[24]

 Reviewing the facts in light of either or both of these standards, Guidry has not shown Marlin (i) knew or had reason to know of any unreasonably dangerous condition, and (ii) failed to exercise reasonable care to make the condition safe or warn him. The equipment was sitting securely on the rig floor when Guidry arrived on the rig floor. No Marlin employee was on the rig floor at the time the accident occurred. Guidry was the sole supervisory person on the rig floor when he was injured. It was Guidry's duty, not Marlin's, to assure his co-employees were conducting their work in a safe manner. Guidry, under the circumstances of this case, may not claim any actions taken by Marlin prior to his arrival on the rig floor caused the accident. If

location of some of the tools afforded some obstacle to a safe performance of the work, the condition was perfectly apparent to all with no showing that the condition or its hazards would not be known to Guidry and his crew. Indeed, Guidry did not challenge this fact, nor was there any sufficient showing that Marlin should realize that it involved an unreasonable risk to Offshore's workers. Under such circumstances we must deny Guidry recovery for it is well settled "[i]f 'either the [contractor] or his employee is in [a] better position to appreciate fully the [obvious] risk and avoid the danger, particularly where the danger is within the control of the [contractor's] own employees', the vessel owner will not be liable." *Id.* (*quoting Stockstill v. Gypsum Transportation*, 607 F.2d 1112, 1117 (5th Cir. 1979)).

 Although Guidry may previously have sought damages for unseaworthiness against Marlin,[25] he may not do so since LHWCA § 905(b) limits third party recovery to negligence.

### The Sanction

Guidry's final complaint is District Court erred by imposing a $500 sanction against

---

*neas Maritimas Argentinas*, 573 F.2d 884, 886 (5th Cir. 1978); *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1035–36 (5th Cir. 1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978); *Brown v. Mitsubishi Shintku Ginko*, 550 F.2d 331, 333–34 (5th Cir. 1977); *Gay v. Ocean Transport & Trading Co., Ltd.*, 546 F.2d 1233, 1238 (5th Cir. 1977). These standards were adopted in the interest of achieving the Congressional desire of uniformity that § 905(b) be applied with an effort to fulfill the following policies:

(1) Congress intends for the federal courts to develop a uniform federal common law to control LHWCA suits against vessels.

(2) That LHWCA federal common law is to be based on negligence concepts; the unseaworthiness of a vessel is not an acceptable ground for relief.

(3) LHWCA negligence law is to be guided primarily by analogy to land-based law concepts. The stevedore is to be viewed generally as an independent contractor and its employees as invitees of the vessel owner.

(4) However, certain common land-based principles of state law are not to be carried over into the federal law governing LHWCA

suits. Assumption of risk may not be utilized as a defense, and comparative negligence, rather than contributory negligence, is to be applied.
*Id.* at 1237–38.

**24.** The Ninth Circuit has declined to follow the land based notions of negligence under § 343A of the Restatement, instead adopting the following less rigid standard:

A vessel is subject to liability for injuries to longshoremen working on or near the vessel caused by conditions on the vessel if, but only if, the shipowner
(a) knows of, or by the exercise of reasonable care would discover, the condition, and should realize that it involves an unreasonable risk of harm to such longshoremen, and
(b) the shipowner fails to exercise reasonable care under the circumstances to protect the longshoremen against the danger.
*Santos v. Scindia Steam Navigation Co.*, 598 F.2d 480 (9th Cir. 1979), *cert. granted* 446 U.S. 934, 100 S.Ct. 2150, 64 L.Ed.2d 786 (1980).

**25.** *See, e. g., Stokes v. B. T. Oilfield Serv., Inc.*, 617 F.2d 1205, 1207 (1980).

his counsel for costs and expenses incurred by Marlin for transportation to the drilling rig in connection with the motion to compel entry. He argues the expenses improperly were taxed against him pursuant to 28 U.S.C. § 1920 [26] and F.R.Civ.P. 37. Moreover, Guidry asserts he did not engage in acts which warrant imposition of sanctions. Consequently, Guidry alleges District Court could not assess the costs against him when no court order was ever violated nor after he filed his appeal when the record had not been held open.

■ Reviewing the record, however, we agree with District Court's imposition of sanctions. The sanctions enumerated by F.R.Civ.P. 37 are not exclusive or arbitrary. Instead, they are flexible and, within reason, may be applied in as many or varied forms as the Court desires by exercising broad discretion in light of the facts of each case. 8 Wright & Miller, Federal Practice and Procedure: Civil § 2289, at 791 (1970). Rule 37 only requires the sanctions the Court imposes "hold the scales of justice even." 8 Wright & Miller, Federal Practice and Procedure: Civil § 2284, at 764 (1970).

More specifically, subsection (d) of Rule 37 permits District Court, in lieu of any order, to require the party failing to respond to a request for inspection issued pursuant to F.R.Civ.P. 34(a) [27] "to pay the reasonable expenses, including attorneys' fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Rule 37(d) comes into play when a notice of the inspection has been properly served. 8 Wright & Miller, Federal Practice and Procedure: Civil § 2291, at 807 (1970). No specific court order is required. *Id.*

In this case, co-counsel for Guidry requested at a pretrial conference they be permitted to inspect the rig. Defense counsel, by letter dated July 19, 1978, informed Guidry's counsel the rig would be available for inspection on July 24th. Co-counsel for Guidry's main counsel had notice on July 21st of the scheduled July 24th inspection. Guidry's counsel failed to notify defense counsel until July 24th, the date of the inspection and after defense counsel had already paid for a helicopter trip to the rig, that Guidry's main counsel wished to inspect the rig personally but would not be able to make the July 24th date. Nor was any reason offered why Guidry's other counsel could not attend the July 24th inspection. The costs resulting from two separate trips to the oil rig constitute undue expenses incurred due to a lack of prompt

**26.** Title 28 U.S.C. § 1920 (1948 & Supp.1978) provides:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

**27.** F.R.Civ.P. 34(a) provides:

Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served; or (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated object or operation thereon, within the scope of Rule 26(b).

communication on the part of Guidry's counsel to defense counsel.

 We also fail to find merit in Guidry's argument sanctions may not be imposed where the record was not held open. The request Guidry be required to pay for the transportation expenses was filed well before Guidry appealed. Similarly, the assessment of these costs were imposed against Guidry prior to filing of the appeal and certification of the record to this Court on November 2, 1978. Any actions taken after that date were to rule on motions filed by Guidry. Federal Rules of Civil Procedure 54(b) permits District Court to enter final judgment as to one or more but fewer than all the parties' claims. Federal Rule of Appellate Procedure 10 provides for the filing of a supplemental record as was done in this case to add after a certified record has been forwarded to the Court of Appeals any material omission affecting the parties' rights. Guidry cites no authority supporting his claim District Court could not impose sanctions when the record had not been held open where the proceedings were initiated prior to filing of his appeal.[28]

District Court granted the sanctions due to Guidry's counsel causing an unnecessary incurrence of expenses. While no technical violation of any particular rule was made by Guidry's counsel, District Court's imposition of sanctions in this case was in keeping with the spirit of the rules. Nor do we find District Court exceeded its jurisdiction by ordering the sanctions after Guidry appealed. Without engaging in concepts of District Court's retention or loss of jurisdiction, or whether we had acquired jurisdiction prior to imposition of the sanction, we simply approve District Court's action as within its broad discretion.

Judgment of District Court was correct. AFFIRMED.

---

28. The only authority Guidry cites is *Saffold v. McGraw Edison Co.*, 566 F.2d 621 (8th Cir. 1977). In *Saffold*, however, no hearing, order, or other proceedings had been initiated prior to filing of appeal as in the instant case.