**NETWORK COMPUTING SERVICES CORP., Plaintiff,**

v.

**CISCO SYSTEMS, INC., Defendant,**

**and**

**Cisco Systems, Inc., Counterclaimant,**

v.

**Network Computing Services Corp. and William P. Charping, Counterclaim Defendants.**

**No. C/A 3:01–0281–17.**

United States District Court, D. South Carolina, Columbia Division.

Aug. 3, 2004.

---

**5.** 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74   (1993).

## ORDER FOR SANCTIONS FOR FAILURE TO PROVIDE DISCOVERY RESPONSES

JOSEPH F. ANDERSON, JR., Chief Judge.

This case involves claims arising from a distributorship agreement entered into by the plaintiff, Network Computing Services Corporation, ("NCS") and the defendant, Cisco Systems, Inc. ("Cisco"). In its complaint, NCS asserted claims for breach of contract, conspiracy, fraud, fraud in the inducement, unfair trade practices, tortious interference with existing or prospective contractual relations, trade secret violations, and anti-trust violations. Cisco asserted a counterclaim against NCS for failure to pay for goods.

NCS is a computer network and systems integrator that provides computer-related services to its customers. Cisco designs computer networking hardware and software which it sells to "end users" directly or via selected "resellers." In May 1998, NCS and Cisco entered into a one-year written contract whereby NCS became a Cisco reseller. The contract was subject to termination at any time by either party upon thirty days written notice.

Over the ensuing eighteen-month period, the relationship between the parties soured. NCS filed suit on January 31, 2001, alleging, among other things, that Cisco engaged in a scheme to lure NCS into a distributorship agreement by intentionally misrepresenting the expected volume of sales and customers, and thereafter undermined NCS's ability to perform its duties under the contract.

The case was initially assigned to United States District Judge Dennis W. Shedd, who referred the entire case to a United States Magistrate Judge. With the case before the Magistrate Judge, both parties moved for summary judgment, and Cisco moved for dismissal as a sanction for alleged discovery abuses by NCS. By the time the Magistrate Judge issued his Report and Recommendation, the case had been reassigned to the undersigned upon Judge Shedd's elevation to the Court of Appeals.

G. Patrick Watson, Powell Goldstein Frazer and Murphy, Atlanta, GA, for Plaintiff.

Wallace K. Lightsey, Henry L. Parr, Jr., William Marvin Wilson, III, Wyche Burgess Freeman and Parham, Greenville, SC, for Defendants.

Michael Hart Montgomery, Montgomery Patterson Potts and Willard, Columbia, SC, for Plaintiff and Movants.

The Magistrate Judge's Report and Recommendation, detailed and comprehensive, suggested that some of the plaintiff's claims should be dismissed on summary judgment and that other claims should be tried to a jury. Regarding the sanctions request, the Magistrate Judge noted that he had already sanctioned NCS once for dilatory discovery responses. Accordingly, he recommended that this court impose a monetary sanction for NCS's failure to produce a customer list in a timely manner, after first suggesting that such a list did not exist.[1] Both sides sought lengthy extensions of time within which to file objections to the Report and Recommendation. Both sides took issue with the parts of the Report and Recommendation adverse to their respective positions.

After hearing oral argument on January 21, 2004, the court determined that it would accept, in part, and reject, in part, the Report and Recommendation of the Magistrate Judge. Specifically, this court granted summary judgment in favor of Cisco on all of NCS's claims except for the claim for breach of the implied covenant of good faith and fair dealing, which, both parties agree, is essentially a breach of contract claim. The court also denied Cisco's motion for summary judgment on its counterclaim for failure to pay for goods and related claims. The specifics of the court's decision, as well as the court's rationale, are set out in a separate order. *See* Order filed February 9, 2004.

As for the Magistrate Judge's recommendation on the sanctions issue, Cisco objected to the Magistrate's determination that the severe sanction of dismissal was not warranted in this case. NCS also objected to the sanctions award, alleging that there was no basis in the record for any type of sanction.

After hearing from counsel, the court determined that the Magistrate Judge's recommendation that NCS be sanctioned should be upheld. The court further determined that, in light of the procedural history of this case and the nature of the misconduct, something more than a monetary sanction was called

for. Rather than take the drastic step of dismissing the action, the court announced that it would instead inform the jury of NCS's discovery misconduct. The court further indicated that it would formulate the precise language to be used in informing the jury of the misconduct at an appropriate time before the trial began.

The case was calendared for trial during this court's July/August 2004 term. During the week prior to jury selection, the parties announced to the court that a rather unusual settlement had been reached, the terms of which would be memorialized in a separate document. Under the terms of the settlement, the lone breach of contract claim would be dismissed with prejudice. Additionally, Cisco's breach of contract counterclaim for goods delivered would be disposed of by a confession of judgment with both parties agreeing to allow NCS to appeal the court's determination that all other claims should be dismissed on summary judgment. NCS also preserved the right to appeal the court's determination that a sanction should be imposed, in the event that the case is reversed and sent back for trial.

Because the sanctions issue will be taken up on appeal, and because this court's earlier ruling did not fully set forth the details of the misconduct and the court's determination of why informing the jury is the appropriate sanction, the court enters this order to completely memorialize its reasoning regarding the sanction. The court notes that a notice of appeal has not yet been filed. However, if an appeal had already been filed, such an order is appropriate under the doctrine allowing this court to enter orders "in aid of an appeal." *See, e.g., In re Grand Jury Proceedings,* 947 F.2d 1188 (4th Cir.1991).

Before addressing the question of whether sanctionable conduct has occurred and, if so, what sanction is appropriate, the court will briefly recount its experience with discovery disputes in recent years. Unlike a majority of District Judges who routinely relegate discovery disputes to Magistrate Judges, this

---

1. The Magistrate Judge also believed sanctions to be appropriate because of NCS's failure to produce requested electronic mail messages and other documents. This court has focused its attention on the customer list because the failures to produce it appear to be the most blatant example of abuse.

court has always heard and decided its own discovery matters. After seventeen years on the bench, the undersigned has concluded that, despite the best efforts of Congress, the Advisory Committee on Civil Rules and other similar bodies, litigation expenses continue to rise, often due to ever-increasing discovery demands and ensuing discovery disputes.[2] As Judge Patrick Higginbotham has observed, "The discovery beast has yet to be tamed."[3]

Additionally, refereeing contentious discovery disputes is, in my view, perhaps the most unwelcome aspect of a trial judge's work. For example, United States District Judge Wayne Alley once vented his displeasure with discovery battles in the following order:

> Defendant's Motion to Dismiss or in the Alternative to Continue Trial is denied. If the recitals in the briefs from both sides are accepted at face value, neither side has conducted discovery according to the letter and spirit of the Oklahoma County Bar Association Lawyer's Creed. This is an aspirational creed not subject to enforcement by this Court, but violative conduct does call for judicial disapprobation at least. If there is a hell to which disputatious, uncivil, vituperative lawyers go, let it be one in which the damned are eternally locked in discovery disputes with other lawyers of equally repugnant attributes.

*Krueger v. Pelican Prod. Corp.*, C/A No. 87-2385-A (W.D.Okla. Feb. 24, 1989).

Resolving contentious discovery disputes is especially difficult in those cases (and there are many) where both sides have behaved badly. Judges often find themselves in a position similar to NFL referees, who have to peel the players off of each other in an effort to find the player in the middle who started the melee. The answer is not always clear and the decision of what sanction, if any, to impose is especially difficult where there is a degree of fault on both sides.

Also, numerical inflation appears to be setting in. In past years, discovery battles typically involved "thousands of documents." Recently, however, one attorney suggested to me at a discovery hearing that, including the request for electronic mail communications, a production request was "likely to exceed one million pages."[4] Further, the parties often overreach in their discovery requests[5] and stonewall interrogatories from their opponents.[6] Hardball discovery, which is still a problem in some cases,[7] is costly to our system and consumes an inordinate amount of judicial resources.[8]

In addition, this court's own firsthand observation of discovery expenditures in civil litigation yields the inescapable conclusion that litigants expend enormous amounts of money on discovery in cases that do not even make it to trial. A recent case on this

2. *See, e.g.,* James S. Kakalik, et al., *Just Speedy and Inexpensive? An Evaluation of Judicial Case Management Under the Civil Justice Reform Act,* RAND INST. 1 (1996) (concluding that Congress's landmark legislation the 1991 Civil Justice Reform Act "had little effect on time to disposition, litigation costs, and attorneys' satisfaction and views on the fairness of case management").

3. Patrick E. Higginbotham, *So Why Do We Call Them Trial Courts?*, 55 SMU L. REV. 1405, 1417 (2002).

4. *Crane v. Int'l Paper Co.,* C/A No. 3:02–3352 (D.S.C. Apr. 25, 2003) (Defendant's Motion for Protective Order, at 2).

5. As one court colorfully observed: Even if one is entitled to embark on a fishing expedition, one must at least use "rod and reel, or even a reasonably sized net [; not] drain the pond and collect the fish from the bottom." *In re IBM Peripheral EDP Devices Antitrust Litigation,* 77 F.R.D. 39, 42 (N.D.Cal.1977).

6. I have presided over one discovery dispute where the defendant's attorney objected to an interrogatory, which essentially sought the names of witnesses, on the grounds that it was burdensome and oppressive, while at the same time propounding an identically-worded question in his own interrogatories.

7. I hasten to add that not all civil disputes involve extensive discovery requests or hardball discovery tactics. In many cases, litigants and their attorneys behave professionally throughout the litigation.

8. I have, on occasion, attempted to avoid duplication of effort by requiring a party to disclose to me if there were prior rulings on discoverability by other judges in cases involving essentially identical claims. Such efforts are usually unsuccessful. I am typically told that litigants have no way of retrieving or assimilating discovery rulings by other judges in related litigation.

court's docket is illustrative. *Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co.*, 336 F.Supp. 610, 2004 WL 2165971 (D.S.C. 2004), involved two female employees who had sued their corporation for sexual harassment in state court. The claimed harassment involved one corporate officer who allegedly groped and inappropriately touched the two employees in the privacy of his office, with no third party witnesses. The claims asserted in the cases were all state law claims for assault and battery, intentional infliction of emotional distress, and the like. There were no complicated Title VII claims or other unique issues in either of the cases—the cases presented a pure swearing contest involving no more than three potential eyewitnesses (the two victims and the defendant). The cases eventually settled prior to trial. The controversy made its way to this court's docket in a declaratory judgment action brought by the insurance companies who refused to provide a defense. In that case, which only involved state law claims, the defense team spent a staggering $1.5 million to engage in discovery prior to settling the cases. *Id.* at 614, 2004 WL 2165971.

In light of the preceding, this court has reluctantly concluded that changes to the rules of civil procedure and other well-intentioned reforms will have only a marginal impact in those cases where abusive and hardball discovery practices occur. It is the undersigned's sincere belief that contentious and expensive discovery battles will continue to present challenges to the judicial system, and that these challenges should be answered by trial judges, who occupy the best vantage point from which to resolve these controversies.

With this background, the court turns to the discovery issue presented in this case. The difficulties experienced by the Magistrate Judge, which in this court's view are all too typical, are best summarized by the Magistrate Judge himself:

The Defendants have filed a motion to dismiss NCS's claims based on NCS's alleged "intentional destruction of material evidence, bad faith obstruction of discovery, and misrepresentations to the Court."

Defendants assert in this motion that Counterclaim Defendant William Charping, Chairman and CEO of NCS, destroyed evidence in the case, that NCS made false representations to the Defendant Cisco and to the Court that it had produced certain discovery, that NCS made false representations to the Court that it could not produce other discovery, and that Charping made false representations to Cisco and to the Court that NCS had produced discovery which it had not. NCS and Charping contest all of these allegations.

The record before the Court shows that, in response to a motion to compel filed by Cisco, a hearing was held on January 30, 2002 at which NCS and Charping were ordered to produce e-mails, letters, and other materials pursuant to a protective order, or in the alternative Charping could submit an affidavit attesting that the materials being sought by Cisco did not exist. NCS's counsel was specifically instructed to admonish his client that he could not go out and destroy documents just because he thought Cisco or others should not be able to see them. NCS was also ordered to provide a customer list, or submit an affidavit attesting that NCS was unable to compile a list of its customers. NCS was given thirty (30) days following specific identification of the documents at issue to produce those documents, or produce the affidavit.

Cisco subsequently filed a motion for sanctions on March 8, 2002 based on NCS and Charping's alleged failure to comply with the Court's order of January 30, 2002. A hearing was held on April 11, 2002, following which the Court entered an order on May 31, 2002 in which the Court noted that NCS's counsel had acknowledged that the deadlines previously set by the Court had not been complied with, nor had any motion for an extension of time or other motion been filed with the Court. The undersigned awarded costs to the Defendants in the amount of $3,407.33 for NCS's failure to appear for a scheduled mediation and for preparation and filing of the motions to compel and for sanctions.

In the meantime, on May 3, 2002 Cisco had filed a motion to strike the Complaint as a sanction for NCS's failure to comply with this Court's prior discovery orders. On May 15, 2002, Charping submitted the previously ordered affidavit, in which he attested that he believed that by March 12, 2002 NCS had provided to counsel all of the information necessary to comply with the Court's order of January 30, 2002, notwithstanding NCS's counsel's previous acknowledgment at the hearing on April 11, 2002 that the Court's January order had not been complied with. Charping also attested that he had not previously submitted an affidavit because he believed he did not need to do so unless certain documents were unavailable or had not been produced. Charping then went on, however, to attest to the non-existence of certain documents which had been ordered to be produced, and further attested that NCS's entire client or customer list and all of NCS's "proposals" were provided to Cisco as part of NCS's initial document responses.

Notwithstanding the statement by Charping in his affidavit, Cisco argued that neither the requested e-mails and letters nor the customer list had been produced by NCS, and on August 16, 2002 the undersigned issued an order requiring NCS to either produce the materials still at issue or to specify where these materials were located within the previously produced documents, as well as other relief. NCS was given ten (10) days to comply with that order, and Defendants were instructed that if NCS failed to comply within ten days, Defendants could file a motion for attorney's fees and costs with respect to all motions to compel. Both parties were further cautioned that failure to comply with the Court's orders could result in additional sanctions in the future.

NCS provided Cisco with a letter and attachments on August 26, 2002, which NCS contends complied with the Court's order of August 16. Defendants concede in their motion that, pursuant to the Court's August 16, 2002 order, NCS produced the e-mails and customer list sought by the Defendants. However, Defendants argue that the e-mails bearing Bates Nos. E1–E9 had never been previously produced, and noted Charping's previous representation that these e-mails did not exist. *See Defendants' Exhibit 6 to Motion to Dismiss filed October 15, 2002.*[9] Defendants also complain that the customer list (which at the January 30, 2002 hearing NCS had argued could not be produced) had also never previously been produced. Defendants further point to Charping's May 23, 2003 affidavit, in which he attested that the e-mails, letters, and customer list had already been produced in September 2001 as part of NCS's initial discovery responses. *See Charping Affidavit filed May 23, 2003, at ¶¶ 4.6 (Court Document # 184).* Defendants argue that sanctions are appropriate because these documents were not finally produced for almost one (1) year after they were due, and seven (7) months after the Court had ordered their production, and that moreover Charping misrepresented to the Court in his earlier affidavit that these documents had been produced in September 2001. *See also, Defendants' Exhibit 4 to Motion to Dismiss filed October 15, 2002.*

NCS disputes Defendants' contentions, arguing that the documents produced on August 26 were not new, but that rather than go through the already produced materials to locate these documents, it just produced them again on August 26, 2002. Defendants correctly pointed out, however, that in making this argument, NCS failed to show where these documents had previously been produced, as was attested to by Charping in his affidavit. Therefore, the Court entered an order on May 8, 2003 requiring NCS and Charping to provide a certification to the Court of where in the previously produced material these documents were located, or in the alternative to certify to the Court that these documents had not in fact been provided. In re-

---

**9.** Exhibits attached to Defendants' motion to dismiss were apparently inadvertently labeled Plaintiff's Exhibits.

sponse, Plaintiff filed affidavits on May 23, 2003 stating that the "customer list" was available in Plaintiff's initial production of September 2001 in the box at Bates Nos. A6398—A6408 in the offices of Plaintiff's counsel, and that the e-mail documents, now identified as E–1 through E–9, were originally treated as privileged and were available for review in the offices of Plaintiff's counsel pursuant to the February 14, 2002 protective order shortly after that date. These affidavits further state that these e-mails were not Bates stamped until copied and produced again for the Court and Defendants' counsel pursuant to the Court's order of May 2002.

In response, Defendants continue to assert that these documents were not in the material which had previously been provided to them for review, and were not in fact provided to the Defendants until September 20, 2002. Defendants point out that, prior to May 15, 2002 (when Charping attested to the existence of the customer list and e-mails in an affidavit), both Charping and Plaintiff's counsel had repeatedly denied that the customer list and e-mails even existed. *See generally, Exhibit A to Defendants' Response filed June 5, 2003.* A review of the transcript of the court hearing held January 30, 2002 confirms Defendants' contention in this regard. *See Transcript,* p. 17.

After review of the affidavits and other materials filed with the Court, the undersigned has determined that there is no way to conclusively determine whether the customer list and e-mails were made available to the Defendants on the date set forth in Plaintiff's affidavits since there are conflicting affidavits and evidence on this point, although the undersigned does find that Plaintiff has failed to adequately explain the discrepancy between the information contained in Plaintiff's May 23, 2003 affidavits and Plaintiff's earlier representations that no customer list and e-mails existed. However, notwithstanding having reached this conclusion, there is no evidence before the Court that the Defendants have suffered any extreme prejudice by not having obtained copies of these e-mails and the customer list until after Au-

gust 16, 2002. Defendants' counsel was unsure at the hearing whether any of the information to be gleaned from these documents would require reopening any depositions, or whether discovery would even need to be reopened at all. Hence, even if this Court were to find that these documents were in fact not made available to the Defendants until after August 2002, the undersigned does not find that the extreme sanction of dismissal is appropriate. *See generally Chandler Leasing Corp. v. Lopez,* 669 F.2d 919, 920 (4th Cir.1982); *Mutual Federal Savings and Loan Ass'n v. Richards & Associates, Inc.,* 872 F.2d 88, 92 (4th Cir.1989) [setting out the standard for dismissal of an action due to misconduct of a party].

Nevertheless, this is not a frivolous matter. If Defendants are correct that the documents produced by NCS on August 26, 2002 had never previously been produced, then the Defendants would have never received these documents had not they filed multiple motions with the Court to finally obtain them, despite NCS having previously been ordered to turn them over. Further, Defendants are correct that, if these documents were in fact never previously produced, Charping not only misled the Defendants and the Court in his original affidavit, but NCS is *continuing* to misrepresent its actions and conduct in the brief and exhibits filed by NCS in response to Defendants' motion to dismiss.

Giving Plaintiff every benefit of the doubt, the Court may find that the cited documents were made available to the Defendants as set forth in Plaintiff's affidavits of May 23, 2003, and that previous statements and representations which had been made by the Plaintiff as to the non-existence of these documents were either intentionally misleading or simply incorrect and made without proper research and review of the materials which Plaintiff had itself provided to its counsel. In either such case, these statements and representations certainly resulted in Defendants and their counsel having to expend additional time and effort towards obtaining these documents than would otherwise

have been required. Therefore, some imposition of further monetary sanctions (in addition to those previously awarded in 2002) may be appropriate. If the Court agrees with this conclusion, then it is recommended that the Defendants be required to file an affidavit with the Court setting forth fees and costs which Defendants contend should be awarded (and which Defendants contend were incurred because of Plaintiff's previous misstatements and/or misrepresentations). After Plaintiff has had an opportunity to respond to the amount of any fees and costs requested, a final decision as to the amount of fees and costs to be awarded the Defendants, if any, could be entered.

Magistrate's Report and Recommendation filed July 25, 2003.

In short, the Magistrate Judge recommended that NCS be sanctioned and suggested that a monetary sanction is appropriate in this case. As noted earlier, however, the Magistrate Judge has *already* imposed a monetary sanction on NCS in this very case.

After hearing from counsel at oral argument, the court determined that, for the reasons stated by the Magistrate Judge, sanctions are appropriate. The court determined, however, that a monetary sanction was not sufficient in light of the circumstances presented here and instead, that the court should sanction NCS by informing the jury of the misconduct. Accordingly, the court entered a brief order informing the parties of this sanction and indicated that the precise language to be used to inform the jury would be determined prior to trial. *See* Order filed Feb.26, 2004.

The court intended to develop the record more extensively during the pretrial conference, but the actions of the parties in aborting the issues the court had set for trial (while preserving their right to appeal earlier rulings of this court), has prompted this opinion so that the Court of Appeals will be more fully apprised of this court's determinations and its rationale for choosing this particular sanction.

As noted in the introductory section of this opinion, abusive discovery tactics are still a major problem in some cases. This court's experience has been that monetary sanctions are usually seen by the offending litigant as a cost of doing business. Here, the damages claimed by NCS (the offending litigant) exceed $33 million. A sanction of $3,407.33 (the amount levied by the Magistrate Judge for the first violation) will do little to deter a litigant who has so much at stake. Conversely, dismissal is a sanction so severe that few District Judges are willing to risk the possibility of reversal for imposing such a draconian measure, even when it appears to be appropriate under the circumstances.

■ This court determines that it has authority to inform the jury of the misconduct under the Federal Rules of Civil Procedure. A recent amendment to the Rules, adopted in connection with the mandatory disclosure of core information required by new federal Rule 26, authorizes the court to inform the jury about the failure to make disclosures required by Rule 26. Fed.R.Civ.P. 37(c)(1). ("[S]anctions ... may include informing the jury of the failure to make the disclosure [required by Rule 26].") Rule 37(d), the Rule that facially applies to the situation presented here, does not contain an explicit reference to informing the jury as a sanction, but does authorize the court to:

> ... make such orders in regard to the failure [to provide discovery] as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of [Rule 37].

Subsection (C) of subdivision (b)(2) of Rule 37 authorizes the court to strike pleadings, dismiss an action with prejudice, or render a default judgment against the disobedient party. Thus, although Rule 37(d) does not contain an explicit authorization to inform the jury of the misconduct by the litigant (as is the case with the failure to make Rule 26 disclosures), the Rule clearly gives this court broad discretion to "make such orders ... as are just" including the extreme sanctions of dismissal and default judgment. If the court has the express authority to impose such harsh remedies, it certainly has the implied authority to impose a less severe sanction, especially when that sanction is one author-

ized by a corresponding rule regarding failure to make Rule 26 disclosure responses.

As the Fifth Circuit Court of Appeals has noted, the sanctions enumerated by Rule 37 are not exclusive, but flexible, and "may be applied in as many or varied forms as the court desires by exercising discretion in light of the facts of each case." *Guidry v. Continental Oil Co.*, 640 F.2d 523, 533 (5th Cir. 1981). A leading treatise notes that "Rule 37 is flexible... The court ... is not limited ... to a stereotyped response. The sanctions ... are not exclusive and arbitrary but flexible, selective, and plural." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2284 (2d ed.1994).

Moreover, at oral argument on the objections to the Report and Recommendation, counsel for both the plaintiff and the defendant acknowledged that this court has the authority to inform the jury of the misconduct as a sanction under the Rules.

■ A moderate approach of informing the jury about the misconduct is especially appropriate in those rare cases where there has been clear and sanctionable conduct by one of the parties. This case is one of those rare cases. Here, an experienced litigant [10] told a United States Magistrate Judge, vested by one of this court's district judges with the authority to hear and decide all disputes relating to this case, that customer lists did not exist. It is unconvincing and inconceivable, given current technology, that a company in the business of computer software failed to keep a list of its customers or could not readily assemble such a list when requested. In this case, after telling the Magistrate Judge that customer lists did not exist, NCS informed the Magistrate Judge that they did, in fact, exist, and that they had been produced in an earlier discovery response.

The circumstances of that earlier response are, to say the least, quite suspicious. At the January 21, 2004 hearing, counsel for Cisco produced copies of the lists that were purportedly produced earlier. Yet careful examination of the font styles on the Bates numbers of the customer lists appeared different from the font styles on the earlier discovery responses. Cisco thus established a strong circumstantial case that the documents had been manipulated to appear as though they had been produced with earlier discovery. According to Cisco, this fabrication could have been achieved by using a gap in the Bates number sequencing to place new numbers on documents not previously furnished in an effort to represent to the court that documents had been furnished, when they had not. When the font style controversy arose at oral argument, the court afforded counsel an opportunity to examine the issue thoroughly and to present an affidavit from someone knowledgeable about computer systems and scanners to explain why the font style might have been different. Shortly thereafter, NCS's local counsel sought, and received, permission to withdraw as counsel of record in this case.[11] The explanation for the variant font style has been received and reviewed by this court, though it yields inconclusive results. Therefore, the court resolves the dispute in favor of NCS since the evidence is inconclusive as to whether any "back dating" of discovery responses occurred.

The fact remains, however, that NCS first represented to the Magistrate Judge that certain garden variety documents did not exist. This representation was made on several occasions. It now turns out that the documents did, in fact, exist. NCS asserts that no prejudice has accrued to Cisco because the documents were eventually produced. This conclusion ignores the fact that they were produced only after several contentious discovery battles before the Magistrate Judge. On this record, the court concludes that a monetary sanction is not appropriate and would not deter future violations. The Magistrate Judge has al-

---

**10.** William Charping, a counterclaim defendant who is one of NCS's principals, has been involved in forty separate lawsuits. *See* Plaintiff's Motion in Limine to Exclude Evidence of Other Litigation, dated Jun. 29, 2004.

**11.** It should be noted that NCS's current local counsel was not local counsel of record when the misconduct described in this order occurred.

ready imposed a monetary sanction on NCS for earlier discovery problems to no avail. The most extreme sanction sought by Cisco, that of a dismissal with prejudice, does not appear to be appropriate in this case given the very high burden a litigant must meet to have its opponent's case dismissed on this ground.

The moderate approach of telling the jury about the misconduct appears to be tailor-made for this case. Accordingly, if this case is reversed and sent back for trial, it is the court's intention to give the jury the following instruction as a sanction for the misconduct set out in this Order:

Ladies and gentlemen, in this case as in every civil case in the federal court system, as part of the trial preparation process the parties are entitled to request information from each other in a process that is known as discovery. Occasionally, disputes arise as to exactly what information has to be produced and whether any such information is in existence.

In this case, Cisco Systems, Inc. asked its opponent, Network Computing Services Corporation, for a list of its customers, a request that this court determined to be an appropriate request for information. Network indicated, on more than one occasion to this court that such a list did not exist. It was later learned, however, that such a customer list did exist, and that list has now been produced to Cisco. You may consider this conduct by Network, along with all the other evidence that you hear during the trial, in deciding the issues presented for your determination in this case.

In adopting what it perceives to be a middle course, the court has rejected the extreme sanction of dismissal, as requested by Cisco, and has also rejected what it views as an inadequate sanction—a monetary penalty as recommended by the Magistrate Judge. The monetary penalty, already imposed by the Magistrate Judge, yielded no deterrent effect. The extreme sanction of dismissal is also inappropriate under the facts of this case. Moreover, the court has cautiously declined to inform the jury that NCS perpetrated an even greater fraud upon the court by attempting to backdate discovery responses. After carefully and calmly reviewing the totality of the circumstances presented here, this court is of the opinion that the sanction chosen by the court is best for this case and will serve to deter the offending litigant from similar conduct in this and future cases.

IT IS SO ORDERED.